## Fownes Trust.

Argued March 23, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*James M. Arensberg,* with him *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*Thomas W. Pomeroy, Jr., Edward A. Craig, III,* and *Clyde W. Armstrong,* with them *Kirkpatrick, Pomeroy, Lockhart & Johnson,* and *Thorp, Reed & Armstrong,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, May 24, 1966:

The question involved is this:

Is the adopted son of one of the children of the life tenant entitled to a share of income under this inter vivos trust?

The Orphans' Court* held that the adopted son of Settlor's deceased grandson was not "issue" within the meaning of the trust and hence was not entitled to any income thereunder.

On December 7, 1933, Henry C. Fownes, as Settlor-Grantor, and his two sons as Trustees, executed an irrevocable deed of trust. The trust was composed of stocks and bonds** which the Settlor owned and trans-

---

\* Sur a trustees' fifth and partial account, which was filed shortly after the death of one of the children of the life tenant.

\*\* These assets are now carried at approximately two million dollars.

478

ferred to the Trustees. In the second paragraph of the trust, Settlor pertinently provided as follows:

"(a) The Trustees shall pay . . . the net income of the trust estate to Amy Fownes Schaeffer, daughter of Grantor, during her life.

"(b) Upon the death of said Amy Fownes Schaeffer the Trustees shall pay . . . the net income of the trust estate, share and share alike, to the children of said Amy Fownes Schaeffer who survive her and to the issue per stirpes of any child who may have predeceased her or not having predeceased her may die before the termination of the trust herein created. . . .

"(c) The Trustees shall have full power and authority in their discretion to distribute to said Amy Fownes Schaeffer and after her death to any other beneficiary hereunder from time to time a portion or portions of principal in addition to income provided for to the end that said Amy Fownes Schaeffer and after her death any other beneficiary hereunder, may receive sufficient sums for maintenance in comfort and security with due provision for sickness or emergency of any kind.

"(d) This Trust shall terminate twenty one years after the death of the last survivor of the children now living of said Amy Fownes Schaeffer and the Trustees shall thereupon divide the principal of the trust estate remaining after all proper charges as herein provided for and pay the same share and share alike among the grandchildren and the issue per stirpes of any deceased grandchild of said Amy Fownes Schaeffer.

"(e) In the event that said Amy Fownes Schaeffer dies leaving no grandchildren nor issue of deceased grandchildren the trust shall terminate upon her death and the Trustees shall pay the principal to the heirs at law of the Grantor at the time of such distribution."

Fownes, the Settlor, died September 27, *1935*. His daughter Amy, the life tenant, died January 4, *1936*.

The trust was to continue until twenty-one years after the death of the last survivor of Amy's children who were living when the deed was executed. Amy had four living children, who were living at the death of both the Grantor and Amy—two daughters and two sons. At the time of the present accounting in 1964, two of Amy's children were living—two daughters, each of whom had three living children. Amy also had had two sons, John and Thomas, each of whom survived her, but John died in 1963 and Thomas in 1964. Neither son had any natural born children, but each had an adopted son, who are the claimants herein.

Amy's son John, on December 20, 1943, adopted a son, John Barnes, III, the present appellant, who was born October 20, 1943. On April 15, 1959, Amy's son Thomas adopted his stepson, Kirk Swing, who was born June 16, 1926.

Prior to the Estates Act of April 24, 1947, P. L. 100, 20 P.S. §301.1 et seq., if a gift was made by an inter vivos deed, the law was long and well established that children and grandchildren meant natural children and grandchildren, and issue meant issue of the body, in the absence of language in the deed showing a contrary intent. In other words, such a gift did not include an adopted child or adopted grandchild or adopted issue. *Storb Appeal,* 400 Pa. 567, 571-572, 163 A. 2d 302. The same interpretation and principle is enunciated in *Howlett Estate,* 366 Pa. 293, 297, 77 A. 2d 390; *Holton Estate,* 399 Pa. 241, 248, 159 A. 2d 883 (and eleven cases cited therein); and in *Tower Estate,* 410 Pa. 389, 189 A. 2d 870.

*Storb Appeal,* supra, clearly and succinctly stated the rule which was adopted by all of the aforesaid cases, viz.: "Prior to the passage of the Acts of 1947,*

---

* and in pertinent situations prior to other legislative Acts, such as the Wills Act, Act of June 7, 1917, P. L. 403, §16(a).

supra, an adopted child was not considered to be embraced within the word 'issue'. In Howlett Estate, supra [366 Pa.], the testator . . . created a trust with life estates to his children and then to a child's issue, or, in default of issue, to surviving children and the issue of deceased children. During the term of the trust a son died leaving no natural born children but a daughter who had been adopted in 1897. Ruling that this adopted daughter of the deceased son was not entitled to take as 'issue', this Court stated (p. 297): ' "Issue" is not synonymous with "children". "Issue" means issue of the body, offspring, progeny, natural children, physically born or begotten by the person named as parent: [citing cases].' "

Furthermore, we believe that the language in Fownes' deed of trust clearly evidenced an intention to benefit his blood line and only his blood line, namely, his daughter Amy and her surviving children or the issue per stirpes of any of her children who may have predeceased her, or not having predeceased her, died before the termination of the trust. It was only in default of grandchildren or issue of grandchildren living at Amy's death that the principal was to go to the heirs at law of the Grantor living at the time of Amy's death.

As Judge Cox said in his able Opinion: "Only one conclusion is possible from this distributive scheme, that is, that the Grantor intended to give trust income and trust principal to those of his blood line only, except in the event his blood line should fail, and that he did not intend, therefore, that the blood line classes to whom he gave trust income and trust principal should include adoptees. The Grantor did not, therefore, intend to include John Barnes, III or Kirk Swing, adopted sons of John Barnes, Jr. and Thomas Barnes, II, (sons of the Grantor's daughter, Amy Fownes Schaeffer) within the class, 'the issue per stirpes of

any child (of Amy Fownes Schaeffer) who may have predeceased her or not having predeceased her may die before the termination of the trust herein' ".

This case under the language of this trust is clearly distinguishable from *Collins Estate,* 393 Pa. 195, 142 A. 2d 178, where the crucial word involved was "descendants".

We are convinced that the interpretation by the Orphans' Court of this deed of trust was correct, and that children adopted by Amy's children have no rights under said deed.

Decree affirmed, at appellant's cost.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Since 1855, when the Legislature enacted the first adoption statute known to this Commonwealth,[1] the direction of the law has been progressively toward complete legal equivalence of relationship by adoption and relationship by blood.[2] As a result, in the 100 years which have passed since legislative sanction was given to adoption in Pennsylvania, adopted children have been all but entirely engrafted onto the family tree of the adoptive parents and accorded all the legal rights of natural children.

However, despite the progressive and enlightened legislation which has sought to accord legal equality to adopted children, the common law, in its treatment of the effect of adoption upon the identification of general designees in wills and deeds of trust, has manifested an unfortunate adherence to the past and has perpetrated barriers to the complete assimilation of adopted children into the adoptive family. The approach taken by the majority in construing the trust instrument which is the subject of the present dispute, in my view,

---

[1] Oler, Construction of Private Instruments Where Adopted Children Are Concerned, 43 Mich. L. Rev. 705, 715 (1945).

[2] Id. at 705.

is an example of such adherence and of this Court's failure to respond to the policy of equality which has otherwise marked the area of adoption and the rights of adopted children.

Whether an adoptee is comprehended by a given designation in a will or deed of trust turns on the "intention" of the testator or settlor. Absent an express direction in the instrument, however, a real intention is seldom discoverable.[3] Yet, the majority, relying on such cryptic and unrevealing terms as "issue" and "children", purports to find such an intention and a direction on the part of the settlor to exclude appellant-adoptee from sharing in the instant trust estate. I disagree. In my view, there is no sound basis for concluding that the settlor, by employing those terms, intended to exclude adopted children from sharing in his bounty. It is far more likely, and more reasonable to assume, that the absence of an express direction with respect to the matter indicates that the settlor failed to advert to the possibility of adopted children, their inclusion or exclusion, and, accordingly, expressed no explicit direction one way or the other. Had he adverted to the question, and determined not to include adopted children as beneficiaries of the trust estate, it is reasonable to assume that he would not have restricted himself to the cryptic designations upon which the majority relies, but would have employed language which would have left no doubt as to his intent.

Thus, in truth, we have no *real* expression of the settlor's "intention" regarding the effect of adoption on the distribution of the trust income and corpus and are confronted with the delicate task of filling "a casus omissi."[4] Traditionally, the result of this process has

---

[3] Id. at 708.

[4] Gray, Nature and Sources of Law, §370 (1909) ; Oler, supra note 1, at 708. It should be noted that the rule of construction contained in §14 of the Estates Act of 1947, P. L. 100, 20 P.S.

largely represented "a union of judicially envisaged social desirability with conjecture as to what the conveyor probably would have intended had he thought about the matter."[5] In the instant case, I am of the view that the relevant considerations dictate the conclusion that appellant was "intended" to be included and to benefit to the same extent as the settlor's other great grandchildren.

In speculating as to what the settlor would have intended had he considered the possibility of a subsequent adoption, the likelihood that he would have desired to benefit *all* those who stood in a close family relationship to the other objects of his bounty is no less than the likelihood that he would have ignored that relationship to discriminate in favor of his natural great grandchildren. The latter conclusion, the one adopted by the majority, places far more emphasis on the affinity of blood relationship over adoptive relationship than the universality of adoption and experience teaches us is justified. Thus, when the settlor made a gift to the "issue" of appellant's adoptive father, I find no reason for concluding that he employed that general designation as an exclusionary term of art with reference to adoptive children. It would be equally plausible, as I consider the matter, to conclude that he employed the term as a general designation to embrace all those who stood in a parental-child relationship, whether formed by blood or the bonds of adoption, with appellant's adoptive father.

My conviction that the majority has erred is strengthened by the fact that given two equally plausi-

---

§301.14, is not controlling since the instant trust, having been irrevocably established in 1933, was created prior to the effective date of that Act on January 1, 1948. Thus, this Court is free to resolve the dispute in accordance with common law rules and in response to common law considerations.

[5] Oler, supra note 1, at 708-09.

ble views, I see no justification for discarding one which fosters the sound public policy of this Commonwealth to accord equality of treatment to adopted children in favor of one which perpetuates distinctions which no longer exist in the eyes of adoptive parents or enlightened modern people everywhere. Thus, the sound approach, as I view the matter, would be to adopt a rule of construction which, *in the absence of a clear expression in the instrument of the settlor's intention to the contrary,* would deem adoptees as embraced within such general designations as "issue" or "children". Such an approach, while not limiting the right of settlors to freely dispose of their property as they see fit and to favor blood lines over adoptive relationships if they so elect, would resolve those cases in which no *explicit* intent is expressed in the most socially desirable manner.

Accordingly, the application of the above mentioned considerations to the language of the trust instrument in this case leads me to conclude that the majority has erred in its construction to deprive appellant of his share under the trust.[6] I therefore dissent.

Mr. Justice MUSMANNO and Mr. Justice JONES join in this dissenting opinion.

---

[6] The inclusion of appellant as a beneficiary of the instant trust estate would not be inconsistent with *Storb Appeal,* 400 Pa. 567, 163 A. 2d 302 (1960), or *Collins Estate,* 393 Pa. 195, 142 A. 2d 178 (1958). *Storb Appeal* was controlled by §14 of the Estates Act of 1947, which is not here applicable, while *Collins Estate* was dictated by the particular instrument there in dispute.