343 A.2d 671
In re ESTATE of Charlemagne TOWER, Deceased.
Appeal of Tripp TOWER and Annette Tower Ragsdale.

Supreme Court of Pennsylvania.

Argued Nov. 29, 1973.

Decided July 7, 1975.

Rehearing Denied Sept. 16, 1975.

Lewis H. Van Dusen, Jr., Philadelphia, for appellants.

William H. S. Wells, Herbert S. Riband, Jr., Philadelphia, for appellees, the Fidelity Bank, and others, Trustees U/W, and others.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

*OPINION*

JONES, Chief Justice.

Charlemagne Tower, a resident of Philadelphia, died on July 24, 1889. He left a will dated May 21, 1889, by which he put his residuary estate in trust for the benefit of his family. The trust is to run for a period of twenty-one years beyond the death of the survivor of a group comprising testator's five children and five grandchildren who were living at his death.

Originally, the trust income was payable to the testator's widow and children, all of whom died some years ago, and the income is now payable to any living grandchildren and to spouses and descendants of deceased grandchildren.

The present controversy concerns the share of Geoffrey Tower, who was a grandson of the testator. Geoffrey died in 1957 and was survived by a widow and four children—two natural children and two adopted children. The widow's name was Annette Tripp Tower; the natural children are Charlemagne Tower, IV, and Helen Tripp Tower Brunet; the adopted children are Annette Tower Ragsdale and Tripp Tower, the appellants. The adopted children were Annette's (Geoffrey's wife's) children by a prior marriage. In 1941, Geoffrey legally adopted them as his own.

At the time of his death Geoffrey was receiving a $\frac{5}{48}$ths share of income of the trust. One-fourth of this became payable to his widow for the period from his death in 1957 to her death in 1959, because under his grandfather's will he had a power to so appoint and he exercised it. The other three-fourths of Geoffrey's $\frac{5}{48}$ths share, and all of it since his widow's death in 1959, is payable to his children. The sole issue is whether this income is payable to all four of Geoffrey's children or only to his two natural children.

After Geoffrey's death the trustees filed an account, which was audited in 1960. At that time, the trustees were unaware of the existence of the two adopted children and therefore did not raise the question whether those children were entitled to participate in Geoffrey's share of income. The Orphans' Court thus awarded the whole share—less only the part payable to the widow—to the two natural children. Thereafter, the adopted children, being advised of the problem, asked the Orphans' Court to open the adjudication, and in January 1962 the court entered a decree granting a review for the limited purpose of determining what rights, if any, the adopted children may have in the trust income. Thereafter, Judge Lefever filed a supplemental adjudication in which he ruled that the adopted children were not entitled to take. *Tower Estate*, 27 Pa.D. & C.2d 114 (O.C.Phila. 1962). The case then went to the court en banc on the adopted children's exceptions and in due course that court filed an opinion and decree in which it dismissed the exceptions and confirmed the supplemental adjudication, 27 Pa.D. & C.2d at 128. The adopted children took an appeal from that decision to this Court. We affirmed, 410 Pa. 389, 189 A.2d 870 (1963) (hereinafter *Tower I*).

In 1972, this Court filed its decision in *Tafel Estate*, 449 Pa. 442, 296 A.2d 797, which altered the law in Pennsylvania by allowing adopted children to share in testamentary bequests on an equal basis with natural children. On the basis of the new rule of law announced in *Tafel*, the adopted children of Geoffrey Tower contend that they are now entitled to participate prospectively in their adoptive father's former share of income.

■■ Testator was an astute, wealthy businessman. His will was clearly and carefully drawn by an obviously learned scrivener. He attempted to leave no detail to chance. He set up a trust to pay the income so long as permitted under the rule against perpetuities, on a per

stirpital basis, and at the expiration of this period to divide the corpus per capita "among all my lineal descendants then living." Adopted children's rights of inheritance are determined by the statutes in force at the time the inheritance became effective, and, when there is a will, by the terms of the will itself: *Storb Appeal*, 400 Pa. 567, 163 A.2d 302 (1960). The meaning of the words used by testator must be determined from the context of the will and the law in force in 1889 when the will became effective: *Collins Estate*, 393 Pa. 195, 142 A.2d 178 (1958).

> "The controlling element in the construction of every will is of course the intention of the testat[or]. *Mulert Estate*, 360 Pa. 356, 61 A.2d 841 [1948]. This intent must be ascertained by a consideration of the *entire* will which is to be read in the light of the surrounding circumstances at the time it was written.[1] *March Estate*, 357 Pa. 216, 53 A.2d 606 [1947]. Since there is no uncertainty or ambiguity in the will, the meaning must be ascertained from the language therein. It is not what this Court thinks [he] might or would have said, or even what the Court thinks [he] meant to say, but what is the clear meaning of [his] words."

*Bigony Estate*, 397 Pa. 102, 104, 152 A.2d 901, 903 (1959).

Testator identified his children and grandchildren by name in his will. He then provided that during their lives his children were to receive income. He then specified that the share of income of a child who died was to be "divided among the children and issue of deceased children" of such child. He made similar provision for his grandchildren and more remote lineal descendants.

Our task in *Tower I* was to determine the *intent* of the testator as reflected in his constant references through-

1. The pertinent portions of testator's lengthy will are set out in *Tower I*, 410 Pa. at 390–92, 189 A.2d at 871–72.

out the will to "children," "grandchildren," "issue" and "lineal descendants." These we approvingly adopted the reasoning of the Orphans' Court that such words were "words of blood" and that, therefore, the testator's language was clear and unambiguous in expressing his intent that persons not in the biological bloodline of the testator were not to participate in the testamentary trust. But in *Tafel Estate, supra,* we eliminated the judicial doctrine that, absent a clear intent to provide for adopted children of beneficiaries other than the testator, the testator is presumed to have excluded such adopted children. We substituted for that doctrine the presumption that such adopted children are *included,* unless the language of the will clearly demonstrated an intent to exclude them. Thus, the threshold question here is whether or not *Tafel* is controlling in the instant case. In other words, does the language in Charlemagne Tower's will present a clear and unambiguous intent to exclude adopted children so that the inclusive presumption of *Tafel* is inapplicable?

In *Tower I,* this Court based its conclusion that the adopted children were not to participate in the trust on the language used by the testator. We there stated:

"[T]he instant testator's will controls the controversy. His meaning must be determined from his will in light of the law in effect on July 24, 1889. His will begins with words of *blood,* viz., 'children', 'grandchildren', 'issue' and 'lineal descendants', and closes with 'descent from me', also words of *blood.* It is inescapable that testator, by the language he used, intended to include only relatives of his blood and to exclude strangers to the blood, as subsequent takers of income on a grandchild's death. [The adopted children], therefore, are not entitled to share."

410 Pa. at 393, 189 A.2d at 872–73.

Since this Court held in *Tower I* that a clear intent regarding adopted children existed in the will of

the testator, we did not, nor did we need to, apply the pre-*Tafel* presumption which excluded adopted children. For the sake of finality and consistency in litigation, we must apply the doctrine of res judicata to uphold our decision in *Tower I* that Charlemagne Tower intended to exclude adopted children.

> "Broadly stated, the rule of res judicata is that when a court of competent jurisdiction has determined a litigated cause of action on its merits, the judgment entered, until reversed, is, forever and under all circumstances final and conclusive as between the parties to the suit and their privies, in respect to every fact which might properly be considered in reaching a judicial determination of the controversy, and in respect to all points of law there adjudged, as those points relate directly to the cause of action in litigation and affect the fund or other subject-matter then before the court."

*Wallace's Estate*, 316 Pa. 148, 153, 174 A. 397, 399 (1934). *Accord, Downing v. Hall Bros.*, 395 Pa. 402, 150 A.2d 719 (1959). Traditionally, there must be four identities existing between two suits in order for the doctrine of res judicata to apply to the suit later in time: (1) identity of the thing or subject matter sued for; (2) identity of the cause of action; (3) identity of parties to the actions; and (4) identity of the quality or capacity of the parties suing and being sued. *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 100 A.2d 595 (1953); *Bennett v. Erwin*, 325 Pa. 330, 189 A. 675 (1937). The rationale of the doctrine of res judicata is to bring an end to vexatious and repetitious litigation. the prohibition against renewed litigation of an old cause of action applies even though the statute upon which a valid judgment is based is later declared unconstitutional and void. *Strauss v. W. H. Strauss & Co., Inc.*, 328 Pa. 72, 76–77, 194 A. 905 (1937); *Philadelphia v. Ridge Avenue Railway Co.*, 142 Pa. 484, 493, 21 A. 982 (1891).

Even if the ratio decidendi of a valid judgment is later ruled improper or erroneous by an appellate court in another case, the parties to the prior litigation are precluded from a new trial of the same cause of action. Restatement of Judgments § 1 (1942) reads:

"Where a reasonable opportunity has been afforded to the parties to litigate a claim before a court which has jurisdiction over the parties and the cause of action, and the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claims and any issue actually litigated in the action shall not be litigated again by them."

Comment b to Section 1 provides:

"The principle stated in this Section is applicable although the judgment was erroneous, either on the law or on the facts. The unsuccessful party has an opportunity to attack the judgment by steps properly taken in the action in which the judgment is rendered. He may take proceedings in the trial court to have the judgment set aside. He may take proceedings in an appellate court to have it reversed. He cannot, however, in a subsequent action relitigate the matters determined by the judgment."

Citing Section 1 and comment b of the Restatement of Judgments with approval, this Court has succinctly summarized the principle: "Thus any mistakes in the original judgment are wrapped up in that judgment and cannot be inquired into thereafter." *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 396, 100 A.2d 595, 599 (1953); *Delaware River Port Authority v. Pennsylvania Public Utility Commission*, 408 Pa. 169, 175, 182 A.2d 682, 685 (1962). *See also Knowles' Estate*, 295 Pa. 571, 145 A. 797 (1929); *Bolton v. Hey*, 168 Pa. 418, 31 A. 1097 (1895).

That a subsequent change in the judicial view of the law shall have no effect on a valid prior adjudication of

the rights of the parties is a necessary and logical deduction from the basic policy of the doctrine of res judicata. To hold otherwise would mean ". . . that a case which has finally and fully been determined can nevertheless later be relitigated if the law with respect thereto seems later to change. This would invite chaos in the law and make judgments uncertain and constantly subject to future changes." *Fiumara v. Texaco, Inc.,* 428 Pa. 302, 306, 236 A.2d 516, 518 (1968).

■ Appellants claim that res judicata cannot be applied in this case because one of the necessary identities is lacking. They assert that there is no identity of subject matter between *Tower I* and the present appeal. *Tower I* dealt with the right to a fund of income accruing up to 1960 and distributed after that date. The appellants here are concerned only with a fund of income accrued since December 11, 1969, and not yet distributed. The appellants are not concerned with any fund which has been properly distributed as a result of a decree of this Court. It is thus claimed that since an entirely different fund is now before this Court than was before the Court in *Tower I* that decision cannot be res judicata here.

*Kellerman's Estate,* 242 Pa. 3, 11–12, 88 A. 865, 868–69 (1913), set forth the "separate funds" doctrine as an exception to the classic res judicata rule:

"The questions of fact which are made the subject of dispute in the earlier adjudication and which were there determined may not again be made the subject of controversy between the parties on the second distribution; the parties to the dispute having had their day in court, and these questions having once been determined by legal method of inquiry, the findings with respect to them must be allowed the same conclusiveness as a verdict of a jury in a common-law action. But the rule of estoppel does not extend to the law which was applied in the earlier distribution to the facts

there ascertained when it comes to the second distribution. Though the decree in the first may have rested on a mistaken application of a rule of law, a circumstance which can only be inquired into on appeal, so long as the decree stands it is conclusive with respects to all rights in the fund distributed; but it cannot be made the basis of an estoppel when another distinct fund is to be distributed, though it be part of the same estate."

In *Brown Estate*, 408 Pa. 214, 230, 183 A.2d 307, 315 (1962), this Court, holding that a prior decision on the distribution of income was not res judicata in a subsequent accounting, stated:

"[B]ecause a ruling of law by an Orphans' Court upon the distribution of a portion of an estate is not binding upon the Court in a subsequent adjudication relating to another portion of the same estate, the broad general principle of res judicata does not apply."

The doctrine of "separate funds" for two different accountings of income of a trust is a deviation from the res judicata principle which has been applied exclusively to cases arising in the Orphans' Court. It has been followed in this Commonwealth for many years. *E. g., Arrott Estate*, 421 Pa. 275, 217 A.2d 741 (1966); *Reamer's Estate*, 331 Pa. 113, 200 A. 35 (1938). *Cf. Pew Trust*, 411 Pa. 96, 191 A.2d 399 (1963).

However, *Kellerman's, Brown, Arrott* and *Pew* did not allow relitigation of a question which affected vested property rights. In *Kellerman's*, the appellant was allowed to reargue that a new rule of law gave her a vested *legal* estate rather than a vested *equitable* estate. *Brown* involved the question of proper investment of trust assets and *Arrott* and *Pew* concerned the proper choice between judicially created and legislatively enunciated rules of apportionment of stock dividends between income and principal. As was stated in *Catherwood Trust*, 405 Pa. 61, 77, 173 A.2d 86, 93 (1961), "[t]here is

no vested property rights [sic] in a court-made rule of apportionment."

Although the definition of income or the status of investments may change from one accounting to another, neither court nor legislature may destroy the natural issue's property rights in the trust income. To hold that adopted children are entitled to trust income would be to partially destroy the natural children's vested rights to the income, which rights were confirmed in *Tower I*.

> "Stated otherwise, if there be *income* arising from the trust, in such *income* the [natural children] have such a property right that brooks no . . . interference."

*Catherwood Trust*, 405 Pa. at 72, 173 A.2d at 91. The "separate funds" doctrine cannot be used to encroach upon vested rights.

*Reamer's Estate, supra,* is the case which most strongly supports the appellants' position. There, this Court allowed the adopted niece of the intestate decedent a review of the decree of confirmation of the account after an earlier review by this Court (*Reamer's Estate,* 315 Pa. 148, 172 A. 655 (1934)) had affirmed the Orphans' Court's first distribution. Appellant contended in *Reamer's II* that there was error manifest upon the face of the record and that she was a party in interest capable of acting as administratrix because she had a statutory right as an adopted child to share in the intestate estate of her aunt. But the rule of law in *Reamer's I* which had precluded the niece from relief was characterized in *Reamer's II* as "so gross a mistake as to amount to a legal fraud," and as "but an inconsistent interlude in the law of the subject with which it dealt." *Reamer's Estate,* 331 Pa. at 123–124, 200 A. at 38. There was not present in *Tower I* such an egregious violation of state decisis. In fact, *Tower I* was consistent with a long line of cases which had preceded it. *See, e. g., Holton Estate,* 399 Pa. 241, 159 A.2d 883 (1966); *Trattner Estate,* 394

Pa. 133, 145 A.2d 678 (1958); *Burnett's Estate*, 219 Pa. 599, 69 A. 74 (1908). We are not convinced that *Tower I* contains any error of law in light of *Tafel*. *Tower I* was based upon a finding of clear intent by the testator to exclude adopted children. *Tafel* announced a new rule that this Court would no longer rely solely on the use of words like "child" and "children" to find an intent to exclude adopted children. But Tower's Will contains more than just passing references to "children" or "grandchildren," and testator's intent is clear beyond question. It is replete with the words "children," "grandchildren," "issue" and "lineal descendants" used in a methodical, precisely-drawn instrument which clearly illustrates that the bounty of the trust was to be confined to bloodlines only. We there concluded from a reading of the instrument as a whole that Charlemagne Tower displayed the requisite intent to exclude adopted children. *Tafel* held that, unless a contrary intention is expressed, the presumption arises that the testator intended to include adopted children. Nowhere is it stated that such a contrary intention must be *explicit*. The intent of the testator, explicit or naturally inferable from his language, is still the polestar of every will. Although words like "issue" and "children" will ordinarily trigger the *Tafel* presumption, in some instances, as in Tower's Will, these words may be used in such a context as to negate the necessity of relying upon the presumption.

█ We hold that res judicata bars the adopted children from relitigating their claim. By no means do we intend to encroach upon the landmark decision in *Tafel*. Although the law of this Commonwealth is replete with progressive judicial pronouncements and legislative enactments which recognize the rights of adopted children, those statutes and cases cannot be construed as an infringement upon the time-honored doctrine of res judicata. Unless the doctrine of res judicata applies to preclude the claim of the adopted children, questions involv-

ing the propriety of a previously adjudicated scheme of ordinary income distribution are apt to be raised by aspiring relatives every time new income received by a trust is ripe for distribution. Despite the unfavorable termination of earlier litigation, such persons may bring suit again and again, thus causing complexity, annoyance and uncertainty to trustees and beneficiaries alike, upon the mere hope of changing the judicial interpretation of a trust instrument or challenging stare decisis.

We hold that the "separate funds" doctrine has no vitality where vested rights, previously affirmed on appellate review, would be affected by a change in the distribution scheme. We further hold that there was no error of law in *Tower I* which would militate in favor of a new distribution scheme to include the adopted children of Charlemagne Tower's grandson.

Decree affirmed. Parties to pay own costs.

NIX, J., filed a concurring opinion.

EAGEN, J., concurs in the result.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

POMEROY, J., did not participate in the consideration or decision of this case.

NIX, Justice (concurring).

I concur in the result reached by the majority because I believe the testator, Charlemagne Tower, did express in his will a clear intent to exclude persons not within his bloodline. I do not accept the majority's application of the doctrine of res judicata to the instant facts.

ROBERTS, Justice (dissenting).

I

In *Tafel Estate*, 449 Pa. 442, 296 A.2d 797 (1972), this Court adopted " 'a rule of construction which, in the absence of a clear expression in the instrument of the settlor's intention to the contrary, would deem adoptees as embraced within such general designations as "issue" or "children".' " Id. at 452, 296 A.2d at 802 (emphasis omitted), quoting *Fownes Trust*, 421 Pa. 476, 484, 220 A.2d 8, 12 (1966) (dissenting opinion). Yet today the plurality concludes from the use of "children," "grandchildren," "issue," and "lineal descendants" that Tower's will "clearly illustrates that the bounty of the trust was to be confined to bloodlines only." Ante at 676. This conclusion is nothing but reliance " 'on such cryptic and unrevealing terms as "issue" and "children," ' " which we foreswore in *Tafel*. 449 Pa. at 451, 296 A.2d at 802. I have no doubt that Mr. Tower " 'failed to advert to the possibility of adopted children, their inclusion or exclusion, and, accordingly, expressed no explicit direction one way or the other.' " Id. I must conclude that Tower's will does not contain "any *expressed* intention . . . to the contrary," (id. at 453, 296 A.2d at 803) and, therefore, if the will were before the Court for the first time today, it would be presumed to include appellants as children of Tower's grandchild. *Tower Estate*, 410 Pa. 389, 394, 189 A.2d 870, 873 (1963) (dissenting opinion); see *Tafel Estate,* supra; *Chase Manhattan Bank v. Mitchell,* 53 N.J. 415, 251 A.2d 128 (1969) ; *Estate of Coe*, 42 N.J. 485, 201 A.2d 571 (1964) ; *Estate of Park*, 15 N.Y.2d 413, 260 N.Y.S.2d 169, 207 N.E.2d 859 (1965).

II

However, Tower's will is not before the Court for the first time today. The opinion announcing the judgment attaches significance to that fact which, in my view, is unwarranted. It has long been the law that successive

accountings in the administration of estates and trusts are considered separate proceedings in which legal determinations made in an earlier proceeding are not binding in a later proceeding.

> " '[T]he rule of estoppel does not extend . . . the law which was applied in . . . [an] earlier distribution to . . . [a subsequent] distribution. Though the decree in the first may have rested on a mistaken application of a rule of law, a circumstance which can only be inquired into on appeal, so long as the decree stands it is conclusive with respect to all rights in the fund distributed; but it cannot be made the basis of an estoppel when another distinct fund is to be distributed though it be part of the same estate."

*Arrott Estate,* 421 Pa. 275, 281, 217 A.2d 741, 745 (1966), quoting *Kellerman Estate,* 242 Pa. 3, 12, 88 A. 865, 868–69 (1913). Accord, *Brown Estate,* 408 Pa. 214, 229–31, 183 A.2d 307, 314–15 (1962); *Reamer Estate,* 331 Pa. 117, 120–24, 200 A. 35, 37–38 (1938); cf. *Catherwood Trust,* 405 Pa. 61, 173 A.2d 86 (1961).

It is clear to me that *Tower I* was "a mistaken application of a rule of law." Therefore, it does not foreclose the Court from applying the law as correctly expressed in *Tafel* to distributions encompassed in the present and future accountings, for " '[w]hile errors committed with regard to one fund may be irremediable as to it, they do not impose upon the court the necessity of persisting in the same errors in the disposition of a subsequent fund.' " *Arrott Estate,* supra, 421 Pa. at 281, 217 A.2d at 745, quoting *Reamer Estate,* supra, at 121, 200 A. at 37.

Thus, there is no reason for the Court in this partial account * to persist in the erroneous determination made

---

* What we said of the appeal in *Arrott Estate,* supra, 421 Pa. at 282 n. 7, 217 A.2d at 745 n. 7, is equally applicable in this case: "The instant appeal . . ., involving a distinct and separate fund from that involved in the prior appeal, and arising out of a subsequent accounting, is not the same case as that involved in the prior proceedings before this Court."

in *Tower I*. On the contrary, it is the duty of this Court and of the orphans' court to require that distribution "be controlled by the law in effect at the time of the audit." *Arrott Estate*, supra, 421 Pa. at 281, 217 A.2d at 745. I would vacate the decree of the orphans' court and remand the case to that court for the entry of a decree based on the application of *Tafel* to Tower's will. Therefore, I dissent.

MANDERINO, J., joins in this dissent.