## Hilton Adoption

*Walter L. Foulke* and *Christopher H. Gadsden,* of *Drinker, Biddle and Reath,* for petitioners.

*Roland Fleer,* of *Waters, Fleer, Cooper and Gallagher,* and *Paul Maloney,* of *Pepper, Hamilton and Sheetz,* for objector and respondent.

TAXIS, *P. J.,* October 29, 1975 — This matter is now before the court upon the petition of Charles E. Buzby, III, et al., to set aside an adoption decree.

On November 4, 1953, after hearing, this court (Holland, P. J.) entered a decree whereby Helene Norris (Helene) was adopted by Percival W. Buzby (Percival) and his wife, Helene T. Norris Buzby (Mrs. Buzby). Helene, who was 21 years of age at the time of the adoption, is the natural grandniece of Mrs. Buzby. She resided with Mrs. Buzby from about 1935 to the date of the adoption (about 18 years), and with both Percival and Mrs. Buzby

from about 1941, the date of their marriage, to the date of the adoption (about 12 years).

Charles Ernest Buzby, the father of Percival, died November 12, 1930, a resident of Philadelphia County. He left one-third of his residuary estate in trust, income to be paid to his son, Percival, for life, and then to Percival's wife, for life, with the corpus to be paid upon the death of Percival and his wife to Percival's children, or, failing to have children, then to the grandchildren of Charles Ernest Buzby. Percival died May 30, 1954, survived by his wife, Mrs. Buzby, and no children except Helene. Mrs. Buzby died on October 14, 1973, and Helene claimed distribution of the trust corpus. The grandchildren of Charles Ernest Buzby thereupon filed a petition seeking to set aside the adoption.

An adoption decree entered by a court having jurisdiction over the subject matter and the parties is generally immune from collateral attack, particularly where the record shows a substantial compliance with the adoption statute. When an adoption decree is collaterally attacked, the entry of the decree raises a presumption of its validity and regularity, and an implication arises that the court did find the necessary facts and did perform all the steps essential to the jurisdiction of the court. The burden is upon the person attacking an adoption decree to establish its invalidity by *clear and convincing evidence:* List Adoption Case, 418 Pa. 503, 508-09, 211 A.2d 870 (1965). Proof of the invalidity of an adoption decree must be clear and convincing and, unless such qualitative standard of proof is met, an adoption decree will not be set aside: Id. at 517.

Petitioner contends that the adoption decree is

invalid because it was procured by a legal fraud practiced upon the court, and because Percival, at the time of the adoption proceeding, was mentally incompetent and lacked the ability to understand the nature and consequences of his acts.

Petitioner alleges that Mrs. Buzby affirmatively misrepresented to this court that she had, on the morning of the adoption hearing, left Percival in Stone Harbor, N. J., because he was suffering from sclerotic hypertension and the automobile trip to Norristown would have been detrimental to his health; and that, in fact, on the date of the hearing, Percival was a patient at the Philadelphia Naval Hospital. Petitioner further alleges that Mrs. Buzby misrepresented the mental health of Percival by intentionally failing to disclose (1) that Percival had been suffering from serious mental illness for several years prior to the adoption proceeding, and (2) that on the date of the adoption hearing Percival was being treated for encephalopathy in the neuropsychiatric ward of the Philadelphia Naval Hospital, having been admitted there on October 26, 1953.

A careful reading of Mrs. Buzby's testimony at the adoption hearing establishes that she did not say that she had left Percival in Stone Harbor, N. J. She stated that *she* had been at Stone Harbor, N. J. She also stated that she did not want to disturb Percival by taking him "all this distance." She said that "It is a long trip all the way up." It is entirely possible that Mrs. Buzby was, at this point in her testimony, thinking of the trip from the Naval Hospital to Norristown, especially since Percival's appearance in court was excused, not because of his geographical whereabouts, but rather because of the danger which travelling a distance would pose

to his wellbeing. Accordingly, evidence that Mrs. Buzby defrauded the court, by misrepresenting Percival's whereabouts, is not clear and convincing.

And with regard to the alleged misrepresentation of his mental health, the court was aware that Percival was 69 years of age, and one of the questions asked by the court indicated that the court appreciated the severity of Percival's condition. The court asked:

"And, he read the petition, or, had it read to him, or, at least, had the contents explained to him?"

(This question was asked before Mrs. Buzby testified as to Percival's condition, but it is apparent from the testimony of Roland Fleer, Esq., that the court had previously been advised of Percival's condition.) Furthermore, Mrs. Buzby acknowledged that Percival was not in good health, that he suffered from *severe* hypertension, that he had a sclerotic condition with hypertension, and that his condition was such that it would have been a serious matter to have him travel a distance. This is not a misrepresentation of Percival's mental health at that time, even as his condition is now described in the record.

The evidence that Percival suffered serious mental illness for several years prior to November 4, 1953, is weak and vague and lacks the qualitative standard of proof required in this proceeding. And the only evidence of Percival's mental condition on November 4, 1953, is a copy of a record of the Philadelphia Naval Hospital, which indicates that he was admitted to the hospital on October 26, 1953, and that his admission diagnosis was "encephalopathy due to arteriosclerosis." This same record indicates that Percival was discharged to his home on December 7, 1953.

Doctor Wilson, testifying as petitioner's witness, stated that it was December 29, 1953, when he first saw Percival and that he took Percival's medical history from information given him on December 30, 1953, by Mrs. Buzby. The history indicates that Percival was taken to the Naval Hospital for a checkup in late October 1953, and was to be discharged after ten days, but a burn on his finger became infected and he remained at the Naval Hospital for about one month. The history indicates that, upon discharge (December 7, 1953), Percival was "not the man [whom Mrs. Buzby] took in to the Hospital [on October 26, 1953]. The history further indicates that Percival could read and write until the week before he was seen by Doctor Wilson on December 22, 1953. And Helene's natural mother testified that she saw Percival around November 23, 1953, and that, although he was apparently under sedation, he knew her and called her by name. The evidence that Mrs. Buzby defrauded the court by misrepresenting Percival's mental condition on November 4, 1953, is, therefore, not clear and convincing.

Petitioner alleges that, at the hearing, Mrs. Buzby affirmatively misrepresented to this court that Percival, as adopting father, fully understood the nature and import of the proceeding, and that, in fact, at the time of the hearing and for some time prior thereto, Percival had been mentally incompetent and lacked the ability to understand the nature and consequence of the adoption.

The record does not establish by clear and convincing evidence that Percival, *on November 4, 1953,* was mentally incompetent or lacked the ability to understand the nature and consequences of the adoption. Doctor Wilson did not see Percival

until almost two months after the date of the adoption hearing, and, according to Doctor Wilson's medical history, Percival's mental condition had deteriorated very rapidly during the time just prior to Doctor Wilson's examination of Percival. Furthermore, it is clear that Percival had, for many years, wanted to adopt Helene. He considered Helene as his daughter, called her his daughter and referred to her as his daughter. She, in turn, referred to him as "daddy." Percival on two occasions approached Helene's natural mother for consent to adopt Helene but her natural mother refused her consent. Accordingly, his adoption of Helene after she attained the age of 21 was consistent with Percival's actions for many years. The evidence that on November 4, 1953, Percival was mentally incompetent and lacked the ability to understand the nature and consequences of the adoption is not clear and convincing.

Petitioner alleges that, at the adoption hearing, *Helene* misrepresented both the mental health and the whereabouts of Percival by intentionally failing to disclose the material facts that Percival had been suffering from serious mental illness for several years prior to the adoption proceedings, and by intentionally failing to disclose the material fact that Percival was, on the date of the hearing, a patient at the Philadelphia Naval Hospital where he was undergoing treatment for encephalopathy. Petitioner further alleges that Helene was a willing and knowing participant in a fraud upon this court in that, at the time of the adoption proceeding, she resided in the home of Percival and knew that he was not in Stone Harbor and that Mrs. Buzby's testimony at the hearing was false.

These allegations are sufficiently disposed of by

the court's discussion of the allegations of fraud on the part of Mrs. Buzby. Additonally, at the time of the adoption hearing, Helene was not staying with Percival and Mrs. Buzby, but had come up from the shore in the early part of the fall and had been staying with some friends at the time of the adoption hearing. There is, therefore, no clear evidence that *Helene* knew of Percival's whereabouts at the time of the adoption hearing. Accordingly, the evidence that Helene participated in the fraud upon the court by misrepresenting the mental health and the whereabouts of Percival is not clear and convincing.

Because the evidence that Mrs. Buzby and/or Helene defrauded the court is not clear and convincing, and because the evidence fails to meet the qualitative standard of proof regarding the invalidity of an adoption, the adoption decree will not be set aside and the petition to set aside the decree is dismissed.

With further regard to the allegations of fraud, the court finds the record lacking in a fraudulent purpose. The essence of fraud is deceit intentionally and successfully practiced to induce another to part with property or with some legal right: Thorne's Est., 344 Pa. 503, 511, 25 A.2d 811 (1942). Motivation for the alleged fraud is *now* apparent, but it was not until 1972 that the Supreme Court of Pennsylvania filed its decision in Tafel Estate, 449 Pa. 442, 296 A.2d 797 (1972), altering the law in Pennsylvania by allowing adopted children to share in testamentary bequests on an equal basis with natural children: Tower Est., 463 Pa. 93, 343 A.2d 671, 673 (1975). In fact, the record establishes that the question of whether Helene had an interest in the Charles Ernest Buzby Trust was

raised in November 1954 before the Orphans' Court of Philadelphia County, and it was stated by William Carson Bodine, Esq., that he had advised Helene that she had no interest in the Charles Ernest Buzby Trust Estate. And Roland Fleer, Esq., testified that at the time of the adoption in 1953, he did not know of any Orphans' Court lawyer who expected the law to be changed, as it was in Tafel Estate. It is not apparent from the record, therefore, that Mrs. Buzby and Helene had some fraudulent purpose in effecting the adoption.

There is still a further reason why the court will not set aside the adoption. The long lapse of time, over 20 years, since the adoption prohibits petitioner from setting aside the decree at this time.

In Brown's Adoption, 25 Pa. Superior Ct. 259 (1904), the widow of an adopted father petitioned to revoke a decree of adoption 21 years after the decree and a year and one-half after the death of the adoptive father. The court refused to revoke the decree and stated, in part, as follows:

"There is another view to be taken of the case. It was held in Wolf's Appeal that the next of kin of the adopting father had not standing to move for the revocation of the decree *which had remained unquestioned for eleven years. . . .* " (Emphasis supplied.) See also Wolf's Appeal, 22 W. N. C. 93 at 96.

In both Brown's Adoption and Wolf's Appeal, the next of kin of an adoptive father were prejudiced (1) by the actions of the adoptive father, and (2) by permitting the decree to remain "unquestioned" for many years. Surely, if Percival, while under no legal disability, had permitted the decree of adoption to remain unquestioned for 20 years, he would not be allowed to question the decree at this time.

Yet petitioner and Percival, in the language of Wolf's Appeal, stand in the very same shoes, and petitioner has permitted the decree of adoption to remain unquestioned for 20 years.

The precise factual situation before the court was considered by the Supreme Court of Indiana: Brown v. Brown, 101 Ind. 340 (1884). There, the heirs of the adoptive father asked the court to set aside the adoption decree ten years after the adoption decree was entered and three years after the adoptive father died. The grounds alleged were (1) that the adoptive father was of unsound mind at the time of the adoption proceedings, and (2) fraud on the part of the adoptee, who was 18 years of age at the time of the adoption. A demurrer to the complaint was sustained and, on appeal, the judgment was affirmed. The court stated, in part, as follows:

"If parties desire to contest the mental capacity of a kinsmen to adopt a child, they must proceed with diligence, and not delay until witnesses have died, have moved away, or have forgotten the matter. It would open the way to the most flagrant abuses to permit a judgment fixing the status of a child to be vacated after such a long lapse of time, and it would also encourage, what equity abhors, sloth and negligence." Id. at 343-44.

In Thaw Estate, 109 Pitts. L. J. 149, a review of an adjudication for fraud was refused where 24 years had elapsed since the adjudication. The court there said that "[a]fter a lapse of 25 years, essential documents are lost, memories become dim and important witnesses die (and) [i]n such circumstances, it is easy to charge fraud and difficult to defend against it." Id., at 160. Cf. Taylor v. Coggins, 244 Pa. 228, 90 Atl. 633 (1914).

Petitioner's case here depends entirely upon cir-

cumstantial evidence and innuendo. There is now no direct evidence of Percival's mental condition on November 4, 1953. However, at the adoption hearing, Mrs. Buzby testified that Percival signed and swore to the petition for adoption in her presence, that Percival either read the petition or had it read to him, or, at least, had the contents explained to him, and that Percival had thoroughly understood the import of the petition and Percival's signature on the affidavit to the petition was notarized by John V. Martin, a notary public.

Petitioner attempts to discredit Percival's execution of the petition by evidence that Percival had been, at about the time of the execution of the petition, at Stone Harbor, N. J., and the notary public was with a law firm in Philadelphia. But the three persons whose actions are being discredited, Percival, Mrs. Buzby and John V. Martin, are all deceased, as is Joseph S. Conwell, Esq., the attorney who prepared the petition for adoption, and cannot be heard to explain the execution of the petition.

Petitioner attacks Mrs. Buzby's testimony that Percival understood the import of the petition by the testimony of Doctor Wilson, who saw Percival for the first time about two months after the adoption hearing. But Doctor Seligman, Percival's family physician and neighbor, is deceased and cannot be heard to describe Percival's condition at about the time of the adoption hearing.

Thus, important witnesses are dead and, in the circumstances, "it is easy to charge fraud and difficult to defend against it." Cf. Thaw Est, supra; Taylor v. Coggins, supra.

By reason of the foregoing, over 20 years having elapsed since the date of the adoption, and, for the

reasons previously stated, the petition to set aside the adoption decree is dismissed.

This decree will become final ten days from its date unless exceptions are filed thereto.