470 A.2d 568

**ESTATE OF Charlemagne TOWER, Deceased.**

**Appeal of Tripp TOWER and Annette Tower Ragsdale.**

Superior Court of Pennsylvania.

Argued April 13, 1983.

Filed Dec. 23, 1983.

Reargument Denied Feb. 14, 1984.

Petition for Allowance of Appeal Granted Aug. 22, 1984.

236

See also 410 Pa. 389, 189 A.2d 870; 463 Pa. 93, 343 A.2d 671.

William C. Bullitt, Philadelphia, for appellants.

Richard W. Stevens, Philadelphia, for Brunet, participating parties.

John R. Suria, Philadelphia, for Fidelity Bank, participating parties.

Alfred Wynne Putnam, Philadelphia, participating party, in propria persona.

Before HESTER, CAVANAUGH and POPOVICH, JJ.

CAVANAUGH, Judge:

On May 21, 1889, Charlemagne Tower, a wealthy industrialist and owner of coal lands, executed his last will and testament. He died shortly thereafter on July 24, 1889. His will was probated in Philadelphia County. A residuary trust was established under Mr. Tower's will and the trust continues. In the course of the last ninety-five years, twenty-three accounts have been filed in the Orphans' Court of Philadelphia County.

Under Item Fifth the testator gave his residuary estate to his trustees, in trust, to pay, after the death of his wife, which occurred several years ago, the income in equal shares to and among his five children, Charlemagne Tower, Jr. (now deceased), Deborah Taylor Lee, (subsequently Janney, now deceased), Emma Snyder (subsequently Reilly, now deceased), Henrietta Tower (subsequently Werts, now deceased) and Grace Tower Putnam (now deceased). Upon each of their deaths his estate was to be held in further trust, to pay income to and among the child or children surviving, and the issue of deceased children of the child so dying, per stirpes, for so long as the testator might prolong distribution of principal without violating the rule against perpetuities.[1] Testator provided for ultimate distribution of

1. Charlemagne Tower's will provided in pertinent part:

   ITEM 4. I have living at the date of this my Will ten lineal descendants: that is to say, five children and five grandchildren. My children living are, Charlemagne Tower, junior; Deborah Taylor Lee, wife of Richard Henry Lee; Emma Snyder, widow of Benjamin C. Snyder, deceased; Grace Williams Putnam, wife of Earl B. Putnam; and Henrietta Tower.

   My five grandchildren living are, Charlemagne Tower, son of my said son, Charlemagne Tower, junior; Ruth Snyder and Emma Tower Snyder, daughters of my said daughter, Emma Snyder; Amelia Tower Putnam and Grace Tower Putnam, daughters of my said daughter, Grace Williams Putnam.

principal which we are not concerned with at this juncture in the administration of the estate.

One of testator's grandchildren was Geoffrey Tower who died on March 26, 1957, and who was survived by his wife

ITEM 5. All the rest, residue and remainder of all my Property and Estate whatsoever and wheresoever, Real, Personal or Mixed, I give devise and bequeath unto my son, Charlemagne Tower, junior, my son-in-law, Richard Henry Lee and Julius A. Bailey, (who for many years has been my trusted assistant and friend,) whom I hereby constitute and appoint the Executors of this my Last Will and Testament, and to their heirs, assigns and successors in the Trusts hereinafter set forth, IN TRUST,

At and after the decease of each of my said five children, severally and successively, his or her share of the income from my Residuary Estate, as above designated shall be appropriated and divided among the children and issue of deceased children of each one of my children as he or she may successively die, in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent, and in like manner the share of income which may accrue to any of my grandchildren or more remote lineal descendants under this my Will and who may die before the period appointed for the distribution of the principal of my residuary estate shall in like manner accrue to their children and issue of deceased children as above provided, and such payment or application of the income of a deceased child's or grandchild's share among his or her children and issue shall continue until the arrival of the period for division of the capital of my said Residuary Estate, and if any one or more of my children or grandchildren shall die without leaving any issue to survive him or her, then the share of income theretofore appointed and payable to such decedent shall go to the other of my children or grandchildren, (as the case may be), then living and the issue of any others of my said children or grandchildren who may then be deceased, in the same way and manner in all respects as are limited and provided in respect to their original shares which shall simply be augmented thereby but in all respects governed by the same provisions as applied to their original shares. PROVIDED always, however, that I authorize and empower each one of my children or grandchildren who may leave a husband or wife surviving him or her, by his or her Last Will and Testament, or any writing in the nature thereof by him or her signed to make provision for any surviving husband or wife either of them may leave surviving, to continue during life but not to exceed one-fourth of the income which would have been payable to such testator or appointer if he or she had remained living. The period I appoint for the distribution of the capital of my Estate and the termination of the Trusts hereby created is at the expiration of twenty-one years from and after the death of the last survivor of my children and grandchildren who may be born in my lifetime, if I may lawfully prolong such distribution until that

who died on December 4, 1959 and by two blood children, Charlemagne Tower, IV and Helen Tower Brunet. Geoffrey Tower was also survived by two adopted children, Annette Tower Ragsdale (formerly Annette Tower Earl) and Tripp Tower. The sole question on appeal is whether Geoffrey Tower's adopted children, Annette Tower Ragsdale and Tripp Tower, are entitled to participate in the share of income that had been paid to their adoptive father during his lifetime. Since the death of Geoffrey Tower only his blood children have shared in the income.

The issue presently before this court has been raised and decided on prior occasions. It was originally raised in 1960 before the Orphans' Court of Philadelphia County. At that time, Judge Lefever in an adjudication approved by the court en banc found that the testator intended, at the time he wrote his will, to include only blood relatives in the class of those who would share in income. Judge Lefever stated in *Tower Estate*, 27 Pa.D. & C.2d 114, 118 (1962):

> Testator made constant reference throughout his will to members of his blood, i.e., "children", "grandchildren", "issue" and "lineal descendents". The sole exceptions to "blood" relatives were his own wife and the surviving spouses of children and grandchildren, to whom he carefully and precisely authorized his children and grandchildren to appoint to the limit of one fourth of their respective shares of income. It is clear, therefore, that testator knew how to provide for blood relatives and for strangers to the blood; and that if he wished to include "adopted children" of a grandchild, he could have, and would have, expressly said so. Testator's intention, affirmative or

period without violating the Rule against Perpetuities, which I do not design to violate. And if that period shall be beyond what the Rule against Perpetuities will allow, then I designate at the expiration of twenty-one years after the death of the last survivor of my above named ten children and grandchildren living at this date; and at such period I direct the division of all the capital of my Residuary Estate among all my lineal descendants then living, to each an equal fractional share, thereof without regard to their stock or the degree of their descent from me.

negative, governs. Nothing in the will shows an intention to include the petitioners.

The Orphans' Court analyzed the meaning that testator gave the term "lineal decendants" and stated at 27 Pa.D. & C.2d 123:

Moreover, testator directed that the remainder be divided among all of his "lineal descendants then living, to each an equal fractional share thereof without regard to their stock or the degree of descent from me". As noted above, testator specifically described his lineal descendants as his children and his grandchildren. If these two points form a straight line, an extension of that line must include only great-grandchildren, great-great-grandchildren, etc., of the blood. To include adopted children of a grandchild within the term "lineal descendants" (which testator has so clearly defined), would require a variance of the straight line which testator drew between the two essential points which he fixed, namely, children and grandchildren (and more remote lineal descendants). Furthermore, by his use, interchangeably, of "issue" and "lineal descendants" testator closed the door to strangers to his blood.

The court found that the testator's manifest intent was to limit the class of income beneficiaries to the blood descendants of deceased grandchildren.

Tripp Tower and Annette Tower Ragsdale, the present appellants, appealed from the Orphans' Court decision to the Supreme Court which affirmed the decree of the Orphans' Court in *Tower Estate*, 410 Pa. 389, 189 A.2d 870 (1963), referred to hereafter as *Tower I*. Five Justices were in agreement with the Orphans' Court's finding that the testator intended only blood descendants of deceased grandchildren to share in income. Justice Roberts (now Chief Justice Roberts) filed a dissenting opinion in which Justice Musmanno joined.

It would appear settled that the adopted children of Geoffrey Tower do not share in the income formerly received by their deceased adoptive father. However, the

trustees filed their twenty-second trustees' account in 1970 because of the death of one of the individual trustees, and the adopted children of Geoffrey Tower again claimed a one-quarter share each of the Geoffrey Tower share of income. The claim was disallowed by the Orphans' Court on the basis that: "the clear language of the will" limited beneficiaries of principal and income to "blood descendants" and on the further basis of res judicata as the law of the case had been established in *Tower I*. The Orphans' Court's adjudication is reported at *Tower Trust*, 62 Pa.D. & C.2d 151 (1970). The present appellants took an appeal to the Supreme Court but before that Court decided *Tower II* it handed down its decision in *Tafel Estate*, 449 Pa. 442, 296 A.2d 797 (1972), opinion by Jones, C.J.; Pomeroy, J. did not participate, Mandarino, J. concurred in the result, and Egan and O'Brien, JJ. dissented. That case involved the interpretation of a 1935 will and the issue was whether the appellants, as adopted children, were entitled to take under a testamentary trust as "children" of the testator's blood son, Adolph Tafel. The Supreme Court in *Tafel* adopted a presumption that the testator intended to include adopted children within the terms "child" or "children" unless a contrary intention appeared in the will. The Supreme Court stated at 449 Pa. 445, 296 A.2d 797, 799:

under our prior case law, in the absence of *any* testamentary language demonstrating the intent of the testator, our courts have *presumed* that the testator, in a will making a gift or bequest to a person or persons other than the testator's "child" or "children," intended to *exclude* adopted children.

The court went on to state at 449 Pa. 452, 296 A.2d 802:

The rule of construction we today recognize equates the rights of natural children and adopted children and executes the legislatively mandated equality so clearly and unequivocally expressed in the statutes of adoption, *i.e.*, that the adopted person "shall have all the rights of a child and heir of" the adopting parents. This rule does not preclude nor prevent any testator who desires to

distinguish between natural and adopted children as recipients of his bounty from doing so; an expression of such intent in his will accomplishes that result.

The Supreme Court decided *Tower Estate*, 463 Pa. 93, 343 A.2d 671 in 1975 (referred to hereafter as *Tower II*) and stated at 463 Pa. 99, 100, 101, 343 A.2d 674:

In *Tower I*, this Court based its conclusion that the adopted children were not to participate in the trust on the language used by the testator. We there stated:

"[T]he instant testator's will controls the controversy. His meaning must be determined from his will in light of the law in effect on July 24, 1889. His will begins with words of *blood*, viz., 'children', 'grandchildren', 'issue' and 'lineal descendants', and closes with 'descent from me', also words of *blood*. It is inescapable that testator, by the language he used, intended to include only relatives of his blood and to exclude strangers to the blood, as subsequent takers of income on a grandchild's death. [The adopted children], therefore, are not entitled to share."

410 Pa. at 393, 189 A.2d at 872–73.

Since this Court held in *Tower I* that a clear intent regarding adopted children existed in the will of the testator, we did not, nor did we need to, apply the pre-*Tafel* presumption which excluded adopted children. For the sake of finality and consistency in litigation, we must apply the doctrine of res judicata to uphold our decision in *Tower I* that Charlemagne Tower intended to exclude adopted children.

. . . . .

The rationale of the doctrine of res judicata is to bring an end to vexatious and repetitious litigation. The prohibition against renewed litigation of an old cause of action applies even though the statute upon which a valid judgment is based is later declared unconstitutional and void. *Strauss v. W.H. Strauss & Co., Inc.*, 328 Pa. 72, 76–77, 194 A. 905 (1937); *Philadelphia v. Ridge Avenue Railway Co.*, 142 Pa. 484, 493, 21 A. 982 (1891). Even if the

ratio decidendi of a valid judgment is later ruled improper or erroneous by an appellate court in another case, the parties to the prior litigation are precluded from a new trial of the same cause of action.

In *Tower II* the Supreme Court recognized that *Tafel* was not controlling as it established only *a rule of construction* which is not applicable where the testator's intent is clear from the will. Justice Nix determined that the doctrine of res judicata did not apply in *Tower II*, but found that the testator clearly manifested his intent to exclude strangers to his blood.

The instant case arises in connection with the audit of the trustees' 23rd Account.[2] Nothing has changed since *Tower II* except the passage of time vis a vis testator's will and the two adopted children of Geoffrey Tower. Certainly, the testator's intent as expressed in his will of May 21, 1889 cannot change. If he manifested a clear intent to limit income to his blood line when he drew his will, subsequent changes of law concerning rules of construction will not affect this. The thrust of the appellants' argument is that the *Tafel* rule must be applied in this case, notwithstanding the Supreme Court's decision in *Tower II* and the lack of any ambiguity in the decedent's will. The Supreme Court answered this contention in *Tower II* and stated at 463 Pa. 105, 343 A.2d 676, 677:

We are not convinced that *Tower I* contains any error of law in light of *Tafel*. *Tower I* was based upon a finding of clear intent by the testator to exclude adopted children. *Tafel* announced a new rule that this Court would no longer rely solely on the use of words like "child" and "children" to find an intent to exclude adopted children. But Tower's Will contains more than just passing references to "children" or "grandchildren," and testator's intent is clear beyond question. It is replete with the words "children," "grandchildren," "issue" and "lineal descendants" used in a methodical, pre-

2. The twenty third account shows a balance of principal of $6,097,-883.17.

cisely-drawn instrument which clearly illustrates that the bounty of the trust was to be confined to bloodlines only. We there concluded from a reading of the instrument as a whole that Charlemagne Tower displayed the requisite intent to exclude adopted children. *Tafel* held that, unless a contrary intention is expressed, the presumption arises that the testator intended to include adopted children. Nowhere is it stated that such a contrary intention must be *explicit*. The intent of the testator, explicit or naturally inferable from his language, is still the polestar of every will. Although words like "issue" and "children" will ordinarily trigger the *Tafel* presumption, in some instances, as in Tower's Will, these words may be used in such a context as to negate the necessity of relying upon the presumption.

The appellants' contention that the *Tafel* rule must be applied in this case relies on a line of *post-Tafel* cases where adopted children had been excluded by a *pre-Tafel* adjudication, and this was reversed by the Supreme Court. The cases relied on in this respect by the appellants are *Flinn Estate*, 479 Pa. 312, 388 A.2d 672 (1978); *DeRoy Estate*, 481 Pa. 403, 392 A.2d 1355 (1978); and *Biddle Estate*, 487 Pa. 616, 410 A.2d 782 (1980). In none of these cases had the Supreme Court already decided that the testator clearly expressed his intention to limit his beneficiaries to his own blood line. Appellants also rely on a *post-Tafel* adjudication in *Riley Estate*, 498 Pa. 395, 446 A.2d 903 (1982). In that case the Supreme Court held that a 1922 will and 1924 codicil referring to "issue" did not indicate a clear intention to exclude adoptees, and under a settled cannon of construction the testator intended to include adopted children. Similarly, in *Riley Estate* the Supreme Court had not previously affirmed a finding of the Orphans' Court that the testator manifested an intent to exclude adopted children.

■ In the instant case testator's intent may be ascertained from his will so that the Rule of *Farmers Trust*

*Company v. Bashore,* 498 Pa. 146, 150, 445 A.2d 492, 494 (1982) is applicable:

> A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument. Only if a settlor's intent cannot be ascertained with reasonable certainty will a court apply canons of construction, to attribute a reasonable intention to the settlor in the circumstances. See, e.g., *Estate of Houston,* 491 Pa. 339, 421 A.2d 166 (1980); *Matter of Tracy,* 464 Pa. 300, 346 A.2d 750 (1975).

*See also, Sykes Estate,* 477 Pa. 254, 383 A.2d 920 (1978).

Testator's will named his "ten lineal descendants", all of whom were of his blood. He provided with respect to income that "in like manner the share of income which may accrue to any of my grandchildren or more remote lineal descendants under this my will and who may die before the period appointed for the distribution of the principal of my residuary estate shall in like manner accrue to their children and issue of deceased children as above provided ..." When testator referred to "lineal descendants" he unequivocally meant descendants of his blood line. "Prior to the passage of the Will's Act of June 7, 1917, P.L. 403, it was the established rule that adopted children could not participate in testamentary gifts to 'children'.... As the testator died five years before the effective date of the Wills Act [of 1917] this is the rule that must govern the interpretation of this will." *Corr's Estate,* 338 Pa. 337, 340, 12 A.2d 76, 78 (1940). In addition, when testator wrote his will the term "issue" referred to heirs of the body. *Ashhurst's Estate,* 133 Pa.Super. 526, 3 A.2d 218 (1938) dealt with the will of a testator which was written in 1892 and who died in 1900. The will established a trust from which income was to be paid to the decedent's wife during her lifetime and at her death the income was to be paid to his children then living "or the issue of any child of mine who may be deceased". One of testator's children died, unmarried and without

issue, and leaving an adopted daughter who claimed the share of income that had been paid to her adoptive mother. The court held that the adopted child could not share, stating at 133 Pa.Super. 529, 530, 3 A.2d 220:

Whatever changes the Intestate Act of 1917 may have made in the distribution of estates of persons dying intestate thereafter, and whatever change the Wills Act of 1917 may make on the construction of wills made or proved after its date, neither of them can change the distribution of his estate prescribed by a testator in his will, made and proved seventeen years before; nor will the Act of April 4, 1925, relating to Adoption, passed twenty-five years after the will was proved, affect its provisions. The will will be interpreted and applied in the light of the law as it was when admitted to probate.

■ We must interpret a will in the light of the circumstances existing when the testator drafted his will. *Houston Estate*, 491 Pa. 339, 421 A.2d 166 (1980). We agree with the Orphans' Court and the Supreme Court that when the testator drafted his will in 1892 he used unequivocal language to limit his bounty to his blood line and no other. The testator delineated under his will as clearly as he could that the objects of his bounty were not to include strangers to his blood.

■ In addition to what we have said above, the decisions of the Supreme Court in *Tower I* and *Tower II* are res judicata. The decision of the Supreme Court in *Tower II* stated that the doctrine of res judicata applied and we are bound by that decision. The court appropriately stated in *Tower II* at 463 Pa. 100, 343 A.2d 674: "For the sake of finality and consistency in litigation we must apply the doctrine of res judicata to uphold our decision in *Tower I* that Charlemagne Tower intended to exclude adopted children."

Decree affirmed.