Lippincott Estate.

Argued April 19, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*J. Kennard Weaver,* with him *Carl B. Stoner,* of *Caldwell, Fox & Stoner,* for appellant.

*Harry A. Takiff,* with him *Myron Jacoby,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 22, 1944:

This is an appeal from the decree of the court below interpreting the directions in the codicil [1] of Eleanor T. Lippincott, dated March 4, 1913, as to the paying over of the principal of her daughter Mabel's share of a trust fund of "$25,367.50 after her daughter Mabel's death, to testatrix's daughters Bessie and Helen and their issue in equal shares." Helen (Mrs. James H. Donnon) died on March 19, 1928, and her estate was settled and awarded by the Orphans' Court of Montgomery County to her son, as her residuary legatee, J. Henry Donnon, Jr. Francis Donnon claimed that he was a son of Helen Lippincott, and after Mabel Lippincott's death he made a claim to share equally with his brother Henry in the principal of the trust fund which had been set apart as provided in the codicil for Mabel Lippincott's "comfortable maintenance and support" during her life. Francis' claim to be a child of Helen Lippincott Donnon

---

[1] The codicil reads as follows: "With the intention of exercising the power of appointment given me by the will of my husband William Aaron Lippincott, I give, devise and bequeath all the property over which I have the right of appointment under the will of my said husband as follows: One third thereof I give to each of my daughters Bessie Lippincott and Helen Lippincott absolutely. The remaining one third I give to my said two daughters and to my son-in-law Tristram C. Colket in trust to apply so much of the income thereof as may be necessary to the comfortable maintenance and support of my daughter Mabel Lippincott, and to pay over any balance of income in excess of what may be necessary for the comfortable maintenance and support of my daughter Mabel to my daughters Bessie and Helen or the survivor of them and upon the death of my said daughter Mabel to pay over the principal of her share to my said daughters Bessie and Helen and their issue in equal shares."

was accepted by the court and no appeal was taken from the adjudication to that effect. The question for us to determine is whether or not the appointment in the codicil gave to Helen a vested remainder. If it did, Francis' claim to a part of the "principal of her [Mabel's] share" must be rejected, because by her will Helen gave her estate to her son, J. Henry Donnon, Jr. But if the word "issue" is used in the codicil in a substitutionary sense, that is, as a word of purchase and not as a word of limitation, both sons take in their own right directly from the appointer.

The majority of the court below held, in an opinion by Judge HUNTER, that there was nothing in the will "which requires us to give the word 'issue' the broad and artificial meaning of 'heirs of the body.'" Judges KLEIN and LADNER in dissenting from the majority opinion declared that "the rule is firmly entrenched in our law" that "the word 'issue' in a will . . . where it is without explanatory words, of itself, is a word of limitation," citing *Clark v. Baker*, 3 S. & R. 470 (1817), and other cases. They say: "the testatrix in the present case used the word 'issue' as a word of limitation and intended to vest her estate in her two daughters, Bessie and Helen."

The controversy in this case stems from the historic Rule in *Shelley's* case, which held that when the ancestor by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail, that always in such cases "heirs" is a word of limitation and not a word of purchase. See 2 Blackstone, page 172. In *Shapley v. Diehl*, 203 Pa. 566, 53 A. 374, Justice MITCHELL speaking for this court said: "The rule in *Shelley's* [2] case is a rule of law, not a rule of

---

[2] in *Van Grutten v. Foxwell*, House of Lords Appeal Cases for 1897, at page 658, Lord Macnaghten gave an interesting review of the origin and purpose of this Rule, which, he said, "has a curious history," and its purpose "has been the subject of controversy. The

construction and where a case falls within it, it applies inexorably without reference to intent." In *Doebler's Appeal,* 64 Pa. 9, 17, Justice SHARSWOOD speaking for this court said of this Rule that it was "unbending" that "it is not competent for the testator to prevent this legal consequence by any declaration, no matter how plain."

If the word "heirs" instead of "issue" had been used in the codicil now before us, we would be obliged to hold that the daughters Bessie and Helen took a vested remainder in the property referred to. There is no such "unbending rule" as to the word "issue" as there is in respect to the word "heirs", and courts when called upon to construe the word "issue" as used in this codicil should determine from either the context or the entire instrument whether the testator meant by the use of this word to describe the quality of the estate of the first taker or meant to create a substitutionary gift for the first taker's "issue". The word "issue" has never been more than *prima facie* a word of limitation; in many instances it has been interpreted as a word of purchase. Baron PARKE and his judicial associates in *Lees v. Mosley, et al.,* 160 Eng. Reports [589] 241 (1836), said: "The word 'issue', however, is more flexible than the expression 'heirs of the body'. In the case of *Cursham v. Newland* (2 Bing. N. C. 58) the word 'issue' was held to be a word of purchase. . . . The words 'heirs' and 'heirs male' . . . must be words of limitation, because heirs are not co-existent. That does not necessarily apply to the word 'issue' which may mean

---

better view seems to be that it is a rule of tenure founded on feudal principles, and that its purpose was to prevent the lord being defrauded of the chief fruits of seigniory. . . . Others, rather I think in anticipation of the course of events and the development of modern ideas, have discovered that it was designed to facilitate the alienation of property and the satisfaction of the ancestor's debt, while one very learned writer is of the opinion that its main object was to exclude the possibility of creating 'an amphibious species of inheritance', calculated to introduce confusion and disorder into the system of our law."

existing issue, or all the descendants, Alderson, B. When the words 'heirs of the body' are used in their proper sense, it is certain that heirs in succession are meant. Therefore, a devise to heirs of the body, 'share and share alike,' is an inconsistency; but a devise to the issue, 'share and share alike,' is not necessarily so."

In *English's Estate,* 270 Pa. 1, 112 A. 913, this court said: "While 'issue,' when used in a devise, has been held time and again to mean the same as 'heirs of the body,' yet such construction was adopted only on the theory that the word was probably so intended by the testator, and not with the idea that the term 'issue,' of and in itself, is the equivalent of the technical phrase 'heirs of the body': *Taylor v. Taylor,* 63 Pa. 481, 484." We said further: "The word 'issue' [as used in a will] never had such technical significance" as the word "heirs," citing *Stout v. Good,* 245 Pa. 383, 385, "and now that estates tail have ceased to exist in Pennsylvania (since the Act of 1855), there is no apparent reason why, in order to construe a devise into an estate tail, so that it may be held a fee, the word 'issue' should have a technical meaning forced on it for the purpose of bringing a devise within the rule of *Shelley's* Case." In *Stout v. Good,* 245 Pa. 383, 91 A. 613, this court held that where words "such as children, or the like" are used in a devise, "the burden rests upon him who claims them to be the equivalent of 'heirs' or 'heirs of his body' to show they were so intended." In *Mayhew's Estate,* 307 Pa. 84, 160 A. 724, this court referred to "the artificial conclusion to the effect that 'issue' meant 'heirs of the body' reached by early courts, influenced by a leaning toward the rule in *Shelley's* case," and declared that it "can do longer be regarded as applicable in interpreting the word where the context of the will does not lead to such conclusion."

It is argued that those three cases cited were all subsequent to the date of the codicil in question, 1913, and that these decisions "changed the theretofore declared

rule." The answer to this is (1) that the decisions referred to did not purport to "change the rule" but to point out that for a long period [3] this court had not felt bound by the Rule in *Shelley's* case to construe "issue" as a word of limitation. In *English's Estate,* supra, where the will was executed in 1904, this court said: "We must first see what fixed legal meaning, if any, that word [issue], as here used, had at the date of the will." We also said in that opinion that the Act of July 9, 1897, P. L. 213, placed a different meaning on the phrase "failure of issue" as used in a will and that since that Act the phrase no longer imported "an indefinite failure of issue" and that the testatrix in that case in using the word "issue" was not "indicating a line of inheritance from the devisee" but was describing "the persons next to take from her"; (2) that as early as 1870, it was declared by this court in *Taylor v. Taylor,* 63 Pa. 481, in an opinion by Justice SHARSWOOD that the word "issue" when used "in a will is to be construed as a word of purchase or of limitation, as will best effectuate the intention of the testator gathered from the entire instrument." Justice SHARSWOOD added "This was well expressed long ago by Chief Justice WILES: 'Why does the word issue in a will signify the same as heirs of the body? Only because it may be supposed that the testa-

---

[3] In *Fed. Land Bank v. Walker,* 345 Pa. 185, 26 A. 2d 436, this court in an opinion by Justice PARKER pointed out in footnote 2(a) at page 189 that in twelve cases, beginning with *Gernet v. Lynn,* 31 Pa. 94, the word "children" as used in wills was construed as a word of purchase. One of the cases cited by Justice PARKER was *Oyster v. Knull,* 137 Pa. 448, 20 A. 624, where this court said that the word "children" as used in a will "is primarily and generally a word of purchase; and, while it may be used to signify 'heirs', or 'heirs of the body,' it will not be so construed unless the testator has employed other words indicative of an intention to use it as a word of limitation." To the same effect was *Affolter v. May,* 115 Pa. 54, 8 A. 20, and in *Huber's Appeal, Gaul's Estate,* 80 Pa. 348, 356, both cited by Justice PARKER. In the latter case we said: "One of the ordinary and most familiar principles of construction is, that the word 'children' is primarily a word of purchase."

tor, who was ignorant of the law, intended it should have that construction. It does not, therefore, ex vi termini create an estate tail in a will as heirs of the body do in a deed, but only when it appears to be the intent of the testator that the word should have that construction, or, at least, that it does not appear that the intent of the testator was otherwise": *Ginger v. White,* Willes Eng. Repts. 125 p. 348.

As early as 1837 this court in *Wells v. Ritter,* 3 Wharton 208, said of the word "issue": "Chief Baron YELVERTON, in *Mandeville v. Carrick,* 3 Ridgeway's P. C. 365, considers it, technically, a word of purchase. Lord KENYON also said, in *Doe v. Collis,* 4 Term Rep. 200, that it is generally considered a word of purchase, and indeed universally so in deeds, though in a will it may be taken as a word of purchase or of limitation, as will best answer the intention of the testator." [4]

It is clear that in interpreting the word "issue" as used in wills, our courts, though not always consistent, were unfettered from the unbending Rule in *Shelley's* case for nearly a century before our decision in *English's Estate,* supra, which the appellants and the dissenting judges of the court below look upon as "bringing about a change in the law" eight years after this codicil was executed and which "change" could have been unknown, they say, to "the expert legal draftsmen who prepared the will and codicils" unless they "can be charged with prescience."

---

[4] In a footnote on *Archer's Case,* 1 Coke, 66 b, p. 674 of 27 Harvard Law Review, appears this statement; "Non-technical words such as 'issue' or 'person or persons who shall be heirs at the death of the life tenant' have been construed as an individual person or class. *Lodington v. Kime,* 1 Salk. 224 (issue) ; *Bowles' Case,* 11 Co. 79 b (issue) ; *Bannester v. Lang,* 17 L.T. N.S. 137 (issue) ; *Evans v. Evans,* [1892] 2 Ch. 173 (persons)." In *Wallace v. Wallace,* 130 Atl. Rep. 116, the Supreme Court of Errors of Connecticut said: "Where the term 'issue' is used in correlation with parent, we have held, in construing other wills, that children were meant by issue, and such has been the general holding elsewhere."

The much earlier decisions we have herein referred to and many others of the same purport must have been well known to these "expert legal draftsmen" and they must have been well aware of the fact that the tendency [5] for over a century was to give to the word "issue" its commonly accepted meaning, to wit, a description of the persons next to take from the testator and not a line of inheritance.

In the codicil the testator disposed of three separate portions of property. The first was one-third of the property over which she had "the right of appointment," and this she gave to each of her "daughters, Bessie Lippincott and Helen Lippincott absolutely". The *income* of one-third still undisposed of she gave to trustees for the support of her daughter Mabel and the "balance" of that income she gave to her "daughters Bessie and Helen or the survivor of them". If one daughter predeceased the other, the latter would receive all of that "balance" of income. That left the *principal* of the above "one-third" undisposed of. If the testatrix had intended to give this to her two daughters Bessie and Helen "absolutely," she knew how to execute that intention, for she

---

[5] The modern tendency, since the Rule in *Shelley's* case no longer serves its feudal purpose, to throw off the fetters of that Rule and the fetters forged out of it when the words "issue" or "children" were used in devises as a possible equivalent of the word "heirs," is manifested in the statutes passed in many states in reference to that Rule and the statutes passed in England and Pennsylvania relative to the conveyance of a fee. In England it was provided by statute, 1890 Victorian Statute 3626, that in devises of land, words of limitation should no longer be necessary to pass a fee. By our own Act of April 1, 1909, P. L. 91, Sec. 3, it was provided that the words "grant and convey, or either one of said words in any deed hereafter executed, shall be adjudged an express covenant to the grantee, his heirs and assigns, to wit . . ." See also the Act of April 30, 1925, P. L. 404.

"When a statute does away with the necessity of using words of limitation to pass the fee, the reason for construing 'issue' as a word of limitation no longer exists." Note on p. 989 of 33 Harvard Law Review and citing 2 Jarman on Wills, 6 Eng. ed. 1950, 51.

had just done that very thing in respect to the *other* two-thirds of the property. If she had intended that upon the death of either Bessie or Helen, before Mabel the life-tenant, the *survivor* of these two daughters should take all of the principal of that one-third, she also knew how to execute that intention for she had just done that very thing with the "excess income" from that one-third. She did neither; but, on the contrary, she provided that upon Mabel's death "the principal of her share" should be paid over to the "daughters Bessie and Helen and their issue in equal shares." We think that in so doing she used the word "issue" as a word of purchase and intended to create a substitutionary gift for the respective issue or children of Bessie and Helen in case either or both of these daughters died before the distribution provided for on the death of the life-tenant should be made.

This conclusion is strengthened by the following circumstances. In her first codicil, dated November 9, 1912, the testatrix disavowed any intention of exercising the power of appointment given her by the will of her husband. A son, this claimant, was born to her daughter Helen, in Chicago on January 26, 1913. On March 4, 1913, or 37 days after "issue" was born to Helen, the testatrix exercised the power of appointment given her by her husband in his will. It was certainly a natural thing for this grandmother to provide in that codicil for Helen's recently born "issue" should Helen not be living when the time arrived for the distribution of the principal which had been set apart for the support of the life-tenant. The use of the word "or" instead of the word "and" after the names of the daughters would more clearly have effectuated the intention we have found to exist in the mind of the testatrix, but it is well known that the words "and" and "or" are frequently used interchangeably. We said in *Hemphill's Estate,* 345 Pa. 451, 29 A. 2d 3: "To effectuate the intention of a testator, the word 'and' may be read 'or'."

The decree is affirmed at appellant's cost.