## Clark Estate

*Benjamin F. Kivnik,* for exceptants.
*Peter F. McManus,* contra.

SHOYER, *J.,* August 16, 1976—Counsel for the two adopted children, who are the exceptants, has stated the issue to be whether Judge Lefever's adjudication of July 31, 1970, is res judicata as to the

present account, which was filed after Tafel Estate, 449 Pa. 442, 296 A.2d 797 (1972), was decided by our Supreme Court.

Testatrix died June 20, 1947, without issue, leaving a will dated August 16, 1929. The gift of her entire estate to her husband failed because he did not survive her. In the alternative, she left her residuary estate in trust, the income being distributable to two tiers of named beneficiaries. The first tier, each entitled to one-fourth of the income for life, were her three sisters and a sister-in-law. On the death of any of the first-tier beneficiaries, the share of the deceased became payable in one-eighth shares to six named nephews and nieces, and the remaining one-fourth share to a niece, Constance Gendell (now Cowell). The income of the second-tier beneficiaries was to be paid until the expiration of 21 years after the death of the last survivor of them, the share of income of any deceased beneficiary to "be paid to the issue per stirpes of the said beneficiary . . . and so continue until twenty-one years after the death of the last beneficiary as aforesaid."

Three of the first-tier beneficiaries died in 1961, 1962 and 1965, respectively. Ronald MacEwen Wilson, one of the second-tier beneficiaries, died June 11, 1969, survived by no natural children, but by two adopted children, the exceptants, who were adopted by him after the date of testatrix' will, but in the lifetime of testatrix, and while the adoptees were minors

At the time of his death, Ronald MacEwen Wilson was in receipt of a 3/32nd share of the trust income ($\frac{1}{8}$th of $\frac{3}{4}$ths), since three of the four first-tier beneficiaries had predeceased him.

Following the death of Ronald MacEwen Wilson, an account was filed and in an adjudication by Judge Lefever on July 31, 1970, this court directed distribution, eliminating the adopted children of Ronald MacEwen Wilson because they did not qualify under section 16(b) of the Wills Act,[1] of June 7, 1917, P. L. 403, 20 P.S. §228, applicable to the estate of testatrix who died June 20, 1947, prior to the effective date of the Wills Act of April 24, 1947, P. L. 89, 20 P.S. §180.1, et seq.

Although the record of the proceedings before Judge Lefever shows that notice of the audit and of the question involved was given to the two adopted children, who were then sui juris, they were not represented at the audit and no exceptions were filed to Judge Lefever's adjudication and no appeal was taken therefrom.

Anna A. Gendell, the last survivor of the four first-tier beneficiaries, died February 7, 1974, and the adjudication here involved was of the third account, which was filed after her death.

The auditing judge, Honorable Charles Klein (formerly President Judge and later, Administrative Judge of this court), held that the adjudication of Judge Lefever, to which no exceptions were filed and from which no appeal was taken, put to rest once and for all the claims of the adopted children and established vested rights in the other

---

1. "Whenever in any will a bequest or devise shall be made to the child or children of any person other than the testator, without naming such child or children, such bequest or devise shall be construed to include any adopted child or children of such other person *who were adopted before the date of the will,* unless a contrary intention shall appear by the will." (Emphasis supplied.)

second-tier beneficiaries and their issue. He thus applied the doctrine of res judicata as expounded by a plurality of our Supreme Court in Tower Estate [No. 2] 463 Pa. 93, 343 A.2d 671 (1975). Tower Estate II, Bell Estate [No. 2], 463 Pa. 109, 343 A.2d 679, and Fownes Estate [No. 2], 465 Pa. 182, 348 A.2d 416, were all decided on July 7, 1975. They form a trilogy of cases all dealing with the rights of adopted children. In Tower and Fownes, only six Justices participated, Mr. Justice Pomeroy absenting himself. In Bell II, all seven Justices were sitting. The application of the doctrine of res judicata was at issue in each of the three cases, although it was not necessary for the decision in Tower II. There, a plurality of the court confirmed the finding of Tower I that the will evidenced the "clear intent" of the testator regarding adopted children so that there was no need to apply the pre-Tafel presumption which excluded adopted children. Mr. Chief Justice Jones, writing the opinion for the court, which confirmed the decision of the court below, stated the rule of res judicata as follows at page 674:

" 'Broadly stated, the rule of res judicata is that when a court of competent jurisdiction has determined a litigated cause of action on its merits, the judgment entered, until reversed, is, forever and under all circumstances, final and conclusive as between the parties to the suit and their privies, in respect to every fact which might properly be considered in reaching a judicial determination of the controversy, and in respect to all points of law there adjudged, as those points relate directly to the cause of action in litigation and affect the fund or other subject-matter then before the court.' "

The opinion also cited Restatement, Judgments

§1 (1942),[2] and comment b to section 1, with approval.[3]

Against the claim by appellants in Tower II that the subject matter was different from Tower I, because it involved subsequent income from the same trust, the Chief Justice observed, at page 676, that:

"The doctrine of 'separate funds' for two different accountings of income of a trust is a deviation from the res judicata principle which has been applied exclusively to cases arising in the Orphans' Court. It has been followed in this Commonwealth for many years. E.g., Arrott Estate, 421 Pa. 275, 217 A.2d 741 (1966); Reamer's Estate, 331 Pa. 113, 200 A. 35 (1938). Cf. Pew Trust, 411 Pa. 96, 191 A.2d 399 (1963).

"However, [the cited cases] did not allow relitigation of a question which affected vested property rights. . . .

"Although the definition of income, or the status of investments may change from one accounting

2. "Where a reasonable opportunity has been afforded to the parties to litigate a claim before a court which has jurisdiction over the parties and the cause of action, and the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claims and any issue actually litigated in the action shall not be litigated again by them."

3. "The principle stated in this Section is applicable although the judgment was erroneous, either on the law or on the facts. The unsuccessful party has an opportunity to attack the judgment by steps properly taken in the action in which the judgment is rendered. He may take proceedings in the trial court to have the judgment set aside. He may take proceedings in an appellate court to have it reversed. He cannot, however, in a subsequent action relitigate the matters determined by the judgment."

to another, neither court nor legislature may destroy the natural issue's property rights in the trust income. To hold that adopted children are entitled to trust income would be to partially destroy the natural children's vested rights to the income, which rights were confirmed in Tower I."

In Bell II, appellants appealed from the action of the lower court in refusing their petition to review the court's former action refusing an adopted child a share of the principal. The opinion for the plurality of the court, again written by Mr. Chief Justice Jones, reads as follows:

"The only factor raised by the petition for review is that the decision in Tafel changed the law which may possibly have been the basis for the earlier decision in the instant matter. We are not convinced that this constitutes an error of law on the face of the record: 'It is well settled that a change in the substantive rule or law upon which a former decree was based does not create "an error of law apparent on the face" of that decree or "new matter" justifying relief by bill of review.' . . ." (p. 682)

In Fownes II, Chief Justice Jones, writing the opinion in support of reversal, said at page 417:

"Initially, it appears that this appeal is governed by the principles which are announced this same day in Tower Estate, 463 Pa. 93, 343 A.2d 671 (1975). The Tower precedent dictates that the matter adjudicated in Fownes I is now res judicata and that the adopted child is precluded from re-litigating his claim.

"Admittedly, there is a material difference between the Fownes Deed of Trust and Tower Will. In our more recent decision in Tower Estate, we stated: 'But Tower's Will contains more than pass-

ing references to "children" or "grandchildren," and testator's intent is clear beyond question. It is replete with the words "children," "grandchildren," "issue" and "lineal descendants" used in a methodical, precisely-drawn instrument which clearly illustrates that the bounty of the trust was to be confined to bloodlines only.'

". . . But we cannot now correct the Fownes I decision. That decision of this Court forever vested the income of the deed of trust in the natural progeny of Amy Fownes Shaeffer. Although a separate fund is now contested here, the separate funds exception to the res judicata rule cannot be utilized to defeat property rights which have already been vested absolutely by a decision of this court. Tower Estate, 463 Pa. 93, 343 A.2d 671 (1975)."

There can be no doubt that the adjudication of Judge Lefever in 1970, not excepted to and not appealed from, became a final judgment. It is also clear that these present exceptants, having failed to litigate the issue before Judge Lefever, which issue was properly raised in the notice given to them by the attorney for the accountant and, subsequently, was carefully considered and decided by the judge against them, was and is a final judgment. In Mershon Estate, 364 Pa. 549, 550, 551, 73 A.2d 686 (1950), our Supreme Court affirmed per curiam the opinion of this court holding that heirs who had received notice of a sizable loss in a formal accounting, but had failed to appear and contest the same, were bound thereby and were not entitled to a review four years later which would relitigate the same issue presented in the earlier accounting. The court said:

518

"The audit of a fiduciary's account is a formal legal proceeding, established under our system of jurisprudence as the time and place at which all beneficiaries and other interested parties must appear to voice any objections they may have to the fiduciary's management of the estate. Failure to appear and object at the audit operates as a conclusive bar to the raising at a later date all objections which could have been made at the audit. The adjudication of the Court places the imprimatur of the law upon the accountant's stewardship for the period covered by the accounting.

"It is the affirmative duty of all competent beneficiaries, upon receiving notice of the filing of an account, to make diligent inquiry concerning the fiduciary's conduct and management of the affairs of the estate. All beneficiaries are chargeable not only with such information as was known to them at the time of the audit but also with what they could have discovered by exercising reasonable diligence."

That the rule of res judicata applies even though the final judgment has not been appealed and decided by a higher court was recently held by our Superior Court in the case of Haines Industries, Inc. v. City of Allentown, 237 Pa. Superior Ct. 188, 355 A.2d 588 (1975). The court relied on and quoted from Love v. Temple University, 422 Pa. 30, 33, 220 A.2d 838 (1966), where the court said:

"Love could and should have taken an appeal from the previous order: the failure to do so renders the doctrine of res judicata applicable and precludes the vacation of the order after the time of appeal has passed."

Exceptants further contend that Judge Lefever erred in excluding adoptees from the "issue" entitled to income under the language of testatrix's

will. They base their contention on recent opinions by our Supreme Court in Fownes Trust I, 421 Pa. 476, 220 A.2d 8 (1966), Tafel Estate, 449 Pa. 442, 296 A.2d 797 (1972), and Fownes Trust II, 465 Pa. 182, 348 A.2d 416 (July 7, 1975). In Fownes I, a majority of the Supreme Court held that John Barnes, III, was not "issue" of his adoptive father, testator's grandson and, accordingly, was not entitled to share in the trust. In Tafel Estate, the Supreme Court held that, in the absence of any express intention to the contrary, it will be presumed that the creator of a trust intended the term "children" to include adopted children. Fownes Trust I was overruled where in conflict with the Tafel opinion.

In April of 1973, the trustees of the Fownes Trust filed a sixth and partial account. At the audit of this account, John Barnes, III, an adoptee, claimed a share of income received by the trustees since the previous accounting, and particularly, after November 17, 1972, which was the date of the Supreme Court's opinion in Tafel. A majority of the Orphans' Court Division of the Court of Common Pleas of Allegheny County held that John Barnes was entitled to take on the basis of the Supreme Court's language in Tafel. Upon appeal, a divided Supreme Court (Mr. Justice Pomeroy not participating) affirmed the lower court so that "issue" as finally interpreted in the Fownes deed included adopted children.[4]

---

4. Edward K. Swing, Jr., another adopted son who was 32 years of age when adopted, did not renew his claim to a share of the trust income, apparently relying upon the Supreme Court holding in Tafel, that that new rule of construction was limited to situations where the adoptee was a minor at the time of adoption: Tafel Estate, 449 Pa. at 454.

What meaning should we give to the word "issue" in this will? In Tower II, we find the answer (463 Pa. 98, 343 A.2d 673): "The meaning of the words used by testator must be determined from the context of the will and the law in force in [1947] when the will became effective . . ."; and in English's Estate, 270 Pa. 1, 5, 112 Atl. 913 (1921), we are advised: "To decide what the present testatrix meant by the use of the word 'issue,' we must first see what fixed legal meaning, if any, that word, as here used, had at the date of the will."

For several reasons, we hold that Fownes Trust is no authority for construing the word "issue" to include the exceptants in this case. In the first place, Fownes involved a deed of trust created on December 7, 1933, which was prior to the effective date of the Estates Act of April 24, 1947, P. L. 100, 20 P.S. §301.1, et seq., which expressly applied only to *conveyances effective* on and after January 1, 1948. Section 14(3) of that statute provided that: "In the absence of a contrary intent appearing therein . . . [i]n construing a conveyance to a person or persons described by relationship to the conveyor or to another, any person adopted before the effective date of the conveyance shall be considered the child of his adopting parent or parents and not the child of his natural parents. . . ." Mr. Justice Roberts, who wrote the dissenting opinion in Fownes I, which subsequently became the controlling law of the case, clearly recognized that the construction which he urged upon his colleagues was not in violation of the statutory canon of construction enacted in 1947. The commission's comment to this clause reads: "This is based on section 14(6) of the Wills Act of 1947, 20 P.S. §180.14. The comments thereto are applicable

here." Turning to the cited section and clause of the Wills Act of 1947, we read: "This takes the place of section 16 of the Wills Act of 1917, 20 P.S. §§227, 228. . . ." Judge Lefever in his adjudication of July 31, 1970, correctly relied on section 16(b) of the Wills Act of 1917, which governs the construction of this will. The explanatory comment to this section by the 1917 Commission, which was headed by Judge John Marshall Gest (who was recognized throughout the Commonwealth as one of our greatest Orphans' Court judges), reads: "This clause is also new. It is *limited to the case of children adopted before the date of the will since it is a statutory canon of construction* referable to the time when the testator makes his will. An extension to include children adopted after the date of the will would tend to defeat the intention of the testator." (Emphasis supplied.)

It is true that the word "issue" has had an uncertain construction under the rulings of our Supreme Court. All of these rulings concerned transfers of real estate and whether the phrase "failure of issue" referred to a "definite" or "indefinite failure" so as to bring the construction within the rule of Shelley's case.[5]

_____

5. Prior to 1885, there were 12 cases, all involving devises of real estate, in which our Supreme Court construed the word "issue" as being a word of limitation: James' Claim, 1 Dallas 47 (1780); Lessee of Evans v. Davis, 1 Yeats 332 (1794); Paxson v. Lefferts et al., 3 Rawle 59 (1831); Price v. Taylor, 28 Pa. 95 (1857); Rancel v. Creswell, 30 Pa. 158 (1858); Potts' Appeal, 30 Pa. 168 (1858); Kay v. Scates, 37 Pa. 31 (1860); Angle v. Brosius, 43 Pa. 187 (1862); Gast v. Baer, 62 Pa. 35 (1869); Kleppner v. Laverty, 70 Pa. 70 (1871); Ogden's Appeal, 70 Pa. 501 (1872); Carroll v. Burns, 108 Pa. 386 (1885). During the same period, however, there were at least 14 cases in which our Supreme Court held the word "issue" to be a word of pur-

Before 1972, there was never any doubt that the word "issue" referred to the blood line. In 1897, the legislature eliminated one uncertainty by stating that, thereafter, "die without issue" meant a definite failure of issue. Our Supreme Court clearly acknowledged the authority of the legislature to define phrases and establish rules of construction by stating, in Lewis v. Link-Belt Co., 222 Pa. 139, 141, 70 Atl. 967 (1908):

"It is notable that an act making so serious a change in the previous law has received so little attention as the Act of July 9, 1897, P. L. 213. It entirely changes the presumption which formerly was in favor of an indefinite failure of issue and substitutes a *statutory presumption* that, in the absence of words indicating contrary intent, a definite failure is to be presumed." (Emphasis supplied.)

In 1934, the General Assembly said that the word "issue" in the descent of estates meant "all lawful, lineal descendants of a common ancestor." And they have continued to say so until this day.[6]

---

chase: Lessee of Findlay et al. v. Riddle, 3 Binney 139 (1810); Stump et al. v. Findlay, 2 Rawle 167 (1828); Abbott et al. v. Jenkins, 10 S. & R. 296 (1823); Way et al. v. Gest, 14 S. & R. 40 (1826); Wells v. Ritter, 3 Wharton 208 (1838); Moss v. Sheldon, W. & S. 160 (1842); Walker v. Milligan, 45 Pa. 178 (1863); Powell v. The Board of Domestic Missions, 49 Pa. 46 (1865); Melsheimer v. Gross, 58 Pa. 412 (1868); Petrow's Estate, 58 Pa. 424 (1868); Taylor v. Taylor, 63 Pa. 481 (1870); Robins et al. v. Quinliven, 79 Pa. 333 (1875); Smith v. Coyle, 83 Pa. 242 (1877); Leightner v. Leightner, 87 Pa. 144 (1878).

6. Statutory Construction Act, May 28, 1937, P.L. 1019, art. VIII, sec. 101, 46 P.S. §601, reenacted May 21, 1943; June 10, 1947; April 6, 1951; June 14, 1957; November 25, 1970; December 6, 1972; and December 10, 1974, P.L. 816 (No. 271) sec. 4. This is now reported in 1 Pa. C.S. §1991.

In Lippincott Estate, 349 Pa. 538, 37 A.2d 599 (1944), our Supreme Court recognized that the rule in Shelley's case is a rule of law, not a rule of construction, and where a case falls within it, it implies inexorably without reference to intent, but there is no such unbinding rule as to the word "issue" as there is in respect to the word "heirs," and the court, when called upon to construe the word "issue" as used in a will, should determine from either the context of the entire instrument whether testator meant by the use of this word to describe the quality of the estate of the first taker, or meant to create a substitutionary gift for the first taker's "issue". The court said:

"The controversy in this case stems from the historic Rule in Shelley's case, which held that when the ancestor by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail, that always in such cases 'heirs' is a word of limitation and not a word of purchase. See 2 Blackstone, page 172.

". . .

"The word 'issue' has never been more than prima facie a word of limitation; in many instances it has been interpreted as a word of purchase." 349 Pa. 540, 541.

Again, on page 544:

"It is clear that in interpreting the word 'issue' as used in wills, our courts, though not always consistent, were unfettered from the unbending Rule in Shelley's case for nearly a century before our decision in English's Estate [270 Pa. 1 (1921)], which the appellants and the dissenting judges of the court below look upon as 'bringing about a change

in the law' eight years after this codicil was executed and which 'change' could have been unknown, they say, to 'the expert legal draftsmen who prepared the will and codicils' unless they 'can be charged with prescience'."

Looking at the whole will in this case, we are convinced there is unmistakable evidence that testatrix used the word "issue" as referring to bloodlines only. Thus, on the second page, she made her gift to her nephew, Ronald MacEwen Wilson, conditional upon his placing and maintaining headstones at the graves of his mother and sister. Upon his failure to do so, he and his issue were to be excluded from participating in testatrix's bounty. The restriction is as follows:

"Provided, however, that no money shall be paid to Ronald MacEwen Wilson unless and until he shall have erected in position granite headstones suitably inscribed with names and dates, above the graves of his mother, Laura Gendell Wilson, and his sister, Mabel Gendell Wilson, in West Laurel Hill Cemetery, unless the said graves are already suitable [sic] marked as above described. Such payments of income shall cease if the stones are removed from the graves. In the event that he does not have the said stones erected after two years from the date when the income becomes payable to him, I order that the income which might have been paid to him hereunder be equally divided among the other beneficiaries and do declare that he or his issue shall have no further interest in my estate."

Judge Lefever, in his adjudication of July 31, 1970, found, upon the recommendation of the guardian-trustee ad litem, that these prescribed conditions had been met by the nephew. The penalty, however, impressed upon her gift by testatrix,

is nothing more nor less than an attainder working corruption of blood. Certainly, she meant that upon failure of Ronald to carry out her wishes, not only he but his whole bloodline should be excluded from participating and taking under her will. We believe that this direction by testatrix, excluding not only her nephew but his "issue", shows conclusively that she meant bloodlines by her use of the word "issue" not only in the instant paragraph but in the other portions of her will. It would be meaningless if her nephew—in the event he had ignored her directions—could then evade this penalty by adopting one or more children who could subsequently qualify as his heirs freed from this attainder.

For the above reasons, including those stated by the learned auditing judge, the exceptions of the adoptees are dismissed, and the adjudication is confirmed absolutely.